## TYSON WILLSON AND WIFE *vs.* W. EASON WILLIAMS, USE OF ALLEN M. HIRSCH.

### *Cancellation of Deed for Fraud—Insufficient Evidence.*

Upon a bill to vacate and annul a deed conveying certain interests in property on the ground that it had been obtained by the fraudulent representations of the grantee, the evidence examined and held to be insufficient to support the allegations of the bill.

*Decided December 6th, 1907.*

Upon motion for re-argument.

*Motion for Re-Argument in Court of Appeals not Operative to Stay Proceedings—Execution for Costs of Appeal—Liability of Cestui Que use for Costs.*

The filing of a motion for a re-argument of a case after it has been decided by the Court of Appeals does not operate as a stay, or prevent the issuing of a *fi. fa.* for costs. In order to have such effect, the party making the motion must ask the Court to take some action in the premises.

The better practice is for the party desiring to have issued a writ of *fi. fa.*
during the period within which, after a case is decided, a motion for
re-argument may be filed, to apply to the Court for leave to issue the
writ.                                                                          ¦

Soon after a bill in equity was filed, the case was entered to the use of A.
and so remained until an appeal was taken and the record and briefs
on appeal printed, when, before decree, an order was filed with the
Clerk of the Court of Appeals to enter the case to the use of B., which
entry was not made with the sanction of the Court. Code, Art. 24, sec.
8, provides that whenever any suit or action, whether in the name of
the State or of an individual shall be marked for the use of any person,
the person for whose use such suit or action is marked shall be liable
for costs, as if he were the legal plaintiff. *Held*, that A. is liable for
the costs incurred at the time the case was entered to the use of B.

*Decided January 15th, 1908.* ·

Appeal from the Circuit Court No. 2, of Baltimore City
(WICKES, J.)

The cause was argued before BOYD, PEARCE, PAGE,
SCHMUCKER and BURKE, JJ.

*Geo. Whitelock* and *W. Thomas Kemp* (with whom was
*David Fowler* on the brief), for the appellants.

*Thomas G. Hayes* and *J. Milton Lyell* (with whom were
*Joseph N. Ulman* and *H. P. Sadtler* on the brief), for the
appellee.

BURKE, J., delivered the opinion of the Court.

On the first day of March, 1902, John Rose leased to Ty-
son Willson and Mary D. Willson, his wife, for the term of
three years, beginning on the first day of January, 1902, and
ending on the 31st day of December, 1904, a tract of land in
Anne Arundel County, lying on the north side of the Patuxent
river, and containing four hundred and ten acres.   This farm
was in a bad condition, and in consideration of certain improve-
ments which the lessees agreed to make, it was stipulated that
they should pay no rent for the first year, but for the second
and third years they covenanted to pay an annual rent of four

hundred dollars on or before the 31st day of December, 1903 and 1904, respectively. The lessees had the right under the terms of the lease to purchase at any time during its existence the leased premises for the sum of thirty dollars per acre pay-able in cash, or one-sixth cash, and the balance in five years from the date of purchase. On the 7th day of August, 1902, the lessees executed under seal an instrument of writing, which is called in the record an agreement and declaration. It re-cites the making of the lease, and contains the following pro-visions: "And whereas the said parties of the first part in pur-suance of said lease did enter upon said land and begin oper-ations in farming and trucking, and it became necessary for them to have furniture, farming implements, vehicles, horses, provender, seed for planting, &c., which they were not, for themselves, able to secure advantageously, and at their re-quest the said W. Eason Williams advanced and assumed the payment of certain bills, all with the understanding that the title to said property so purchased and secured and hereafter to be purchased, together with the profits, income and increase thereof, should be and remain in the said W. Eason Williams until the amount, paid or assumed by him, or to be at any time hereafter assumed and paid by him, shall be repaid by the said parties of the first part, together with interest at the legal rate." The negotiations for this lease were conducted by Mr. Williams, and in the early part of the year 1902, the Willsons took possession of the farm.

On the 16th day of February, 1903, Tyson Willson and wife executed and delivered to W. Eason Williams an abso-lute deed of all the rights, titles, interest, property, claim, and demand at law and in equity of which the grantors "now have and may have at any time hereafter, or be in anywise entitled to, in, into, or out of the property and estate left by the said Tyson Willson's great grandfather, Isaac Tyson, Jr., deceased, by his last will and testament dated the 9th day of May, 1861, and duly proven and recorded in the office of the Register of Wills of Baltimore City in Liber I. T. C. No. 30, folio 158; also in, unto and out of all the property and estate left by the said

Tyson Willson's grandfather, Richard W. Tyson, deceased, by his last will and testament dated 21st of May, 1869, and duly proven and recorded in the office of the Register of Wills of said city in Wills Liber J. H. B. No. 39, folio 302, &c.; and also in, unto and out of all the property real, personal and mixed now belonging to the trust estate of the said Richard W. Tyson, deceased, which estate is now being administered in the Circuit Court of Baltimore City in the case of *Jesse and James W. Tyson, Trustee,* v. *Julia McHenry Tyson, et al.*"

By deed dated April 2nd, 1904, W. Eason Williams and wife reconveyed the interest and estate mentioned in the above deed to Tyson Willson. This deed of reconveyance was recorded on the 9th day of April, 1904. On Febuary 10th, 1905, W. Eason Williams filed the bill in this case, in the Circuit Court No. 2, of Baltimore City, for the cancellation of the deed of reconveyance upon the ground that it had been obtained by fraud practiced upon him by the appellants. The bill recited the making of the lease, and the agreement and declaration above mentioned; the making of the deed of February 16th, 1903, from Tyson Willson and wife to him, which he alleges to have been made for, "further securing" the money already advanced and thereafter to be advanced.

On the 4th day of May, 1904, Tyson Willson and wife executed a mortgage upon the property and estate mentioned in the deed of reconveyance to William B. Willson to secure a loan of two hundred and forty dollars and interest. The mortgagee is made a party defendant in this case, and he is alleged to have known at the time of the execution of the mortgage. that the deed of reconveyance was without consideration, and that the same had been fraudulently recorded.

The specific relief asked for is the annullment of the deed of April 2nd, 1904, and the mortgage given to William B. Willson. The precise fraud practiced upon him by which he alleges the deed was procured is thus stated in the third, fourth, and fifth paragraphs of the bill: 3. That thereafter the said Tyson Willson and Mary D. Willson, his wife, being already greatly indebted unto your orator for the amount

of advances made by your orator to said Tyson Willson, and for bills and accounts paid and assumed by your said orator for the account of said Tyson Willson, at his request, with interest thereon, the said Tyson Willson applied to your orator for still further sums of money, but your orator being at that time unwilling as well as unable to make further advances of money to the said Tyson Willson declined so to do.    Whereupon the said defendant, Tyson Willson, stated to your orator that said defendant's father, William B. Willson, was very anxious to obtain a reconveyance of said (defendant's) Tyson Willson's interest in the two estates above mentioned as having been heretofore conveyed to your orator, and that if your orator would execute and deliver to him, the said Tyson Willson, a deed reconveying the said interest in said estates that said defendant would be able to obtain from his father said William B. Willson, the sum of $5,000 upon a mortgage on said defendant's interest in said estates, and it was accordingly agreed between your orator and the said Tyson Willson that one-half of the amount obtained or intended to be obtained from the said William B. Willson was to be paid to your orator on account of the advances above mentioned, and that as a security for the balance the said Tyson Willson would deliver to your orator a second mortgage upon his interests in said estates. And it was further agreed that in the event of failure to obtain advances from the William B. Willson, the said deed should not be recorded, but should be re-delivered to your orator.

"4. That said defendant Tyson Willson failed to obtain from his father, William B. Willson, the aforesaid sum of $5,000, or any other sum of money, and so advised your orator.    Whereupon your orator demanded from the said Tyson Willson the return of the aforesaid deed, and repeated this demand upon numerous occasions, and upon each occasion was promised it "in a few days," or "the next time you come to the farm," and your orator was upon each occasion assured that the said deed was not being used for any purpose whatsoever.

"5. That the said defendant, Tyson Willson, did not redeliver the said deed to your orator and never has done so, but, to

the contrary, without the knowledge or consent of your orator placed the same on record among the land records of Baltimore City, and your orator believes and is advised, and therefore charges that the said deed had been already fraudulently recorded by said Tyson Willson at the time assurances were given by him to your orator that the same had not been recorded, or used for any purpose whatsoever."

He filed with the bill a statement which showed that the appellants were indebted to him in the sum of $19,262.22 for money paid and advanced on account of their farming operations under the lease.

It is unnecessary to set out with any particularity the allegations of the answers filed by the defendant. The fraud averred is distinctly denied by all the defendants. The indebtedness alleged is also denied. It is asserted that the setting aside of the deed and mortgage will furnish no security to the plaintiff for any claim he may have, because it is averred the interest and estate attempted to be conveyed by that deed is an unassignable contingent interest.

The case was heard upon bill, answer, replication, and a great mass of testimony taken in support of the conflicting contentions of the parties, and on the 27th of April, 1907, the Court dismissed the bill as to William B. Willson, but set aside and annulled the deed of April 2nd, 1904. It declined to pass upon the validity, legal operation, and effect of the deed of February 16th, 1903;—the right of Tyson Willson and wife to raise in any competent proceeding any question concerning the effect of that deed was expressly reserved by the decree. From that decree this appeal was taken.

Before the relief prayed for can be granted, the proof in the case must bring it within the principles stated by this Court in *Ranstead* v. *Allen*, 85 Md. 482. In that case JUDGE BOYD, speaking of the jurisdiction of a Court of equity to set aside instruments because of fraud, and of the character of testimony required to be offered before the Court will exercise that power, said: "It is an exercise of power fraught with much danger, unless guarded with an ever zealous care to see that there is

no uncertainty about the evidence relied on.  This Court has in several cases adopted the language of the Supreme Court of the United States in the case of *Atlantic Delaine Company* v. *James*, 94 U. S. 207, on this subject, "that cancelling an executed contract is an exertion of the most extraordinary power of a Court of equity.  The power ought not to be exercised except in a clear case, and never for alleged fraud, unless the fraud is made clearly to appear, never for alleged false representations, unless their falsity is certainly proved, and unless the complainant has been deceived and injured thereby."

Does the proof of fraud produced by the complainant gratify these requirements?  This question must be determined from a consideration of all the facts and circumstances of the case, which may be invoked to support the allegations of fraud charged in the bill.  In determing the value of the testimony upon this point it is of great importance to understand the comparative ability, capacity, and business experience of the parties, and the relations they occupied toward each other.  It must be conceded that W. Eason Williams was the dominating and controlling force in all their transactions.  He was well educated, and had a varied business experience.  He had learned three trades,—milling, plumbing, steam, gas and water heating; he was an expert stenographer and typewriter, and a fair accountant; he was a graduate in medicine and had practiced that profession for about three years; he was a member of the bar, and had been Secretary to the President of the Seaboard Air Line; he was a speculator in stocks; had a general all around and wide experience in railroad and electric work, and a promoter of many different enterprises, and was engaged in selling stock for the firm of Middendorf & Company when he first met Tyson Willson in December, 1901. Tyson Willson was a weak, dependent, and unfortunate young man.  He had no business capacity, and seems to have been utterly unable to provide for himself and wife.  Mrs. Willson had been raised upon a farm, and had some knowledge of farming.  Tyson Willson was a wreck from the excessive use of whiskey and drugs of various sorts, and there is testimony

in the record tending to show that Mrs. Wilson had indulged, while on the farm, in the excessive use of drugs and strong drink, but notwithstanding this deplorable habit the record shows that amidst all the inconveniences, hardships, and well nigh intolerable conditions which confronted her during the occupancy of the farm she was industrious, and spared herself no labor in her efforts to succeed and discharge her obligations to the appellee. Her letters show her solicitude for him and Mrs. Williams. In the letter of April 1st, 1904, she said "don't let Mrs. Williams change her mind about spending the summer. Tell her we can fix things up, and she can do just as she likes, and we will try to make her comfortable." According to his own testimony the appellants voluntarily suggested the making of the deed of February 16th, 1903, and their confidence was such that it was made absolute in form, although it was intended merely as an additional security. The appellee has also testified that twenty-five-hundred dollars of the amount to be borrowed upon the estate mentioned in the reconveyance, "he was either to give them in cash, or hold it for them subject to their demand."

The superior business capacity and experience of the appellee, his evident dominating control in all matters relating to the management of the farm, the candor manifested in the letters of Mrs. Willson, and the confidence which she and her husband reposed in his judgment and integrity speaks strongly against the suggestion that they either could, or would practice fraud upon the appellee, and render any such suggestion highly improbable. The appellee's case must stand or fall upon his own testimony, and the letters of Mrs. Willson which he introduced in evidence. There is no other evidence in the case from which it could be argued that the charges of fraud made in the bill are supported.

Before the testimony of the appellee, bearing directly upon the charges of fraud complained of, is considered, notice must be taken of certain circumstances which seriously impair the credibility of his testimony. First, after testifying that he agreed at the time the Willsons leased the farm that he would

advance three thousand dollars, he said Mr. Rose had agreed with him to put up one-half of this amount. "He would furnish $1,500, and I would furnish $1,500, and he and I would back up the Willsons to the amount of $3,000." Rose positively denied this statement, and also testified to the misappropriation by the appellee of the proceeds of a promissory note which he had left with him for collection. Secondly, he is flatly contradicted upon important and material points of his testimony by Messrs. William B. Willson and George Whitelock. He testfied that Mr. Whitelock told him that William B. Willson would advance five thousand dollars. This is denied by Mr. Whitelock. He testified that William B. Willson told him that Tyson Willson's interest in the estate conveyed by the deed of February 16th, 1903, was worth eighteen to twenty-three thousand dollars. This statement is denied by Mr. Willson. Thirdly, his business methods, as reflected in his conduct in dealing with Mr. Whitelock and with Mr. Marshall, of the Safe Deposit and Trust Company were not characterized by openness and candor, and do not commend him favorably to the consideration of a Court of equity. On July 30th, 1903, Mr. Marshall wrote to the appellee stating that the Safe Deposit and Trust Company, as trustee under the will of Richard W. Tyson, had sold certain real estate belonging to the trust; that he found on the files of the company a copy of the deed from Tyson Willson and wife to the appellee, also a copy of his petition filed in the case of *Tyson* v. *Tyson*, in the Circuit Court of Baltimore City. He then states, "it being necessary for Mr. Willson and his wife and child to be parties to this proceeding, we have been in correspondence with him and have his consent, and he informs us, referring to this assignment to you, that the same was only intended to secure certain advances which you have made and which you are to make him, and that you are to execute a paper to this effect. Would it not be desirable to have the record in that case establish the matter fully? The appellee wrote to Mr. Marshall on August the 11th, 1903, and said, "I am sorry to note that you incorporated in your petition that you are ad-

vised that the grant made to me by Mr. Willson and wife was
not absolute. It seems to me it was entirely unnecessary to
mention this matter in your petition, particularly as the bill re-
cites there is an absolute grant. If it becomes necessary, *I
will enter a denial in this matter."* When examined as a wit-
ness upon this subject he said that he meant by his statement
to Mr. Marshall that if it became necessary he would deny
both as a matter of fact and record that it held the deed by
way of security for advances. On January the 7th, 1904, the
appellee wrote to Mrs. Willson stating that it would take
forty-seven hundred and sixty dollars to balance the account
between them. · Under the impression that this embraced the
entire claim of the appellee, Mr. William B. Willson referred
the matter to Mr. Whitelock with a view of effecting a settle-
ment of the account. Mr. Whitelock testified that he had
never heard of any other account of Dr. Williams than the
one aggregating forty-seven hundred dollars, and that he re-
membered distinctly that Mr. Willson, Sr., would only agree
to pay a moderate percentage, say fifty per cent, of it to get it
out of the way, and what he and I wished to accomplish by
that settlement "was the complete elimination of Dr. Williams
from the situation; that as I recall was the object of the whole
thing." When examined as to what transpired between him-
self and Mr. Whitelock in reference to the settlement of that
account, the appellee testified as follows: Q. Did you ever
admit to Mr. Whitelock that the forty-seven hundred and
sixty dollars was the balance due?. A. The balance due as
per that statement; he had the statement in his office at the
time. Q. That is not intended as the entire settlement of
your account? A. No sir. Q. When you offered to settle the
whole thing for twenty-three hundred dollars you had a men-
tal reservation of some account you had not produced yet? A.
I agreed to accept in twenty-four hours fifty cents on the
dollar. Q. You had this other thing up your sleeve? A.
What other? Q. This unpaid balance account? A. That re-
mained just the same; I was to be secured afterwards for that.
Q. Did you say anything about that to him? A. Who? Q.
Mr. Whitelock? A. No sir.

2. We will now examine the testimony of the appellee in support of the fraud charged. And it is to be noted first, that there is not a particle of evidence in the case to sustain the allegation that Tyson Willson stated to the appellee that his father, William B. Willson, was very anxious to obtain a reconveyance of Tyson's interest in the two estates mentioned in the deed of February 16th, 1903; secondly, that the only act which in terms is charged to be fraudulent is the placing on record of the deed of April the 2nd, 1904. It is not charged that the alleged statement of Tyson Willson that, if the property was reconveyed to him, he would be able to obtain from his father five-thousand dollars on a mortgage was a fraudulent statement, or that the appellee was misled or deceived thereby; thirdly, that the bill makes no charge of fraud against Mary D. Willson. When asked to state the circumstances under which the deed of April 2nd, 1904, was made he answered as follows: "They requested me to make further advances, which I was unable and unwilling to make at the time, and they told me that if they could procure the deeding back of the interest in the estate, *they thought* they would be able to raise as much as five-thousand dollars, one half of which was to be returned to me as a credit on advances already made, and the balance either to be paid in my hands and called for by them as they wanted it, or to be given to them in cash; the question was asked me by Mrs. Willson whether if the deed was used for this purpose by mortgaging it or securing a loan upon it, my further interest could be protected, and I told her that I thought it could by an additional agreement to be made after she secured the loan of $5,000.00, an additional agreement was made between us; and it was understood that this was to be done in the case they were successful in securing the $5,000.00." He was then asked by counsel for defendant if he had finished his answer, and to this he replied that he did not know whether he had or not, until the question and answer had been read. When this was done he stated that he had no further answer to that question. But this answer fell very far short of proving the

allegations of the bill, or showing fraud in the procurement of the deed.

In his subsequent testimony in response to question by his counsel he stated that the appellants were to get the $5,000 from William B. Willson; that the balance of interest in the estate was to be secured to him after the mortgage had been given; that in the event of the failure of the defendants to obtain the money from William B. Willson the deed was to be returned to him; that they did not obtain the $5,000 from William B. Willson; that he asked for and was promised the return of the deed, but discovered that it had been recorded, and that the property had been conveyed to William B. Willson to secure a small loan.    But on cross-examination he testified that there was no restriction upon the defendants as to where they should get the $5,000; that they were at liberty to obtain it from any source upon the security of the property reconveyed; and that he knew they would have difficulty in obtaining a loan *unless the deed was promptly recorded.*

Upon the evidence in the record a reason may be assigned for the making of this deed which entirely excludes the hypothesis of fraud, although, assuming the appellee to have advanced the sum claimed, it does not account for such a transparently foolish enterprise.    At the date of the lease this property was in a neglected and unproductive condition.    For six years Mr. Rose had been losing money on the farm, and wanted someone to run it on a profitable basis.    For this purpose Williams secured the Willsons as lessees.    He must have known that Tyson Willson was utterly incompetent, and he ought to have known that Mrs. Willson could not succeed. Tyson Willson had not a dollar to put into the operation, and the appellee knew that William B. Willson would not advance money for such an undertaking.    From his own testimony it is a tax upon one's credulity to believe that he thought that William B. Willson would loan the appellants $5,000 for any purpose, and he does not state that he believed they would. He knew that Mr. Willson had declined, for want of available funds, to settle his claim for forty-seven hundred and sixty

dollars on the basis of one-half. He held the deed of February 16th, 1903, upon which Tyson Willson had endeavored unsuccessfully to effect a loan, and the appellee regarded this deed as worthless as a collateral for a loan. On April 2nd, 1904, when the deed of reconveyance was made, and for some time prior thereto, the situation at the farm, as shown by the letters of Mrs. Willson, was desperate and pathetic. They had no money to buy feed for the stock, or provisions for themselves. The cows were dying, and the horses were starving. In one letter she tells the appellee that her husband had asked his father to loan him twenty-five dollars, and that he had told them he would not know where to turn to get it; that she only had seventy-five cents to run the house on. In another she said she was not able to work the horses, because they were so weak and thin for want of feed. The letters in evidence show that the appellants thought that, if they had a reconveyance of the property and a life insurance policy effected upon Tyson's life, they might be able to borrow *some money* to relieve the desperate conditions which confronted them. But in none of these letters does it appear what amount they thought could be raised.

Under these circumstances and in the hope that some money might be secured, it is probable the deed of reconveyance was made. This view is supported by many facts in the case, especially by this testimony of the appellee: "What I did say to her when she, as she stated, suggested to me that money might be raised on the security I held in the shape of a deed was, that I could not use it as collateral, I was not using it as collateral, and that for such a purpose it was not worth ten cents to me; that if she or Tyson Willson could use it for the purpose of raising funds to help them out and to help me out, I would be glad to reconvey the deed to them for that purpose, and if they were successful, they were to divide the proceeds of such a loan with me, and if not the deed was to be returned to me to put it in its original form."

After a careful examination and consideration of all the evidence produced by the plaintiff, our conclusion is that it does

not support the essential allegations of the bill.    The decree must, therefore, be reversed, and the bill dismissed.

> *Decree reversed, and bill dismissed,
> with costs to the appellants above and
> below.*

A motion for a re-argument and a petition relating to liability for costs were subsequently filed and in disposing of the same,

BOYD, C. J., delivered the opinion of the Court.

This bill was filed February 10th, 1905, and the case was entered to the use of Joseph N. Ulman on March 11th, 1905; which was before the answers were filed and continued in that way until November, 1907.    It was then entered to the use of Allen M. Hirsh.    When the printing of the record was paid for and even when the briefs were printed the case still stood to the use of Mr. Ulman, but before the decree was passed by this Court it had been entered to the use of Mr. Hirsh.    An order was filed by the appellants to issue a *fieri facias* for the costs and the same day a motion for a re-argument was filed by the appellee.    Two questions are therefore presented to us.

1st. Does the motion for re-argument prevent the issuance of a *fieri facias* for costs?    And,

2nd. If not, can a writ of *fieri facias* issue against Joseph N. Ulman under the circumstances above stated.

1. Rule 15 of this Court provides that "No case will be re-argued after the opinion of Court has been delivered unless a re-argument shall be requested by some member of the Court who concurred in the opinion, and no motion for a re-argument shall be filed after the expiration of thirty days from the day the opinion is filed."    That is the only rule of this Court, and we have no statute, on the subject.    It is manifest that there is nothing in it which in terms gives such motion the effect of a *supersedeas.*    In *Chappell* v. *Chappell,* 82 Md. 646, appeals from orders which had been passed were dismissed on the ground that they were not final.    The appellant filed a motion for a re-argument and pending that motion (January

16th, 1896) the lower Court passed an order making two of the previous orders liens on Mr. Chappell's property, and further directed him to satisfy the arrearages of alimony, suit money and counsel fees required by previous orders, within ten days. He resisted the order on the ground, amongst others, that the motion for re-argument was pending when it was passed. This Court in passing on that question in 86 Md. 538, said: "The pendency of a motion for re-argument of the previous appeals did not oust the jurisdiction of the Circuit Court for Baltimore County." It is true the Court referred to *Rohrback* v. *Rohrback*, 75 Md. 317, where it was held that the lower Court could allow counsel fees and costs to a wife on her application, after an appeal had been taken by the husband from a decree dismissing his bill for a divorce. But if a motion for a re-argument had the effect of staying further action on the decree of the Court in ordinary cases, it would have prevented such action on the orders from which appeals had been taken and dismissed, until the motion had been disposed of. Our predecessors followed the rule of the Supreme Court of the United States in *Brown* v. *Aspden*, 14 How. 25, "That a re-argument of a case decided by this Court will not be granted unless a member of the Court who concurred in the judgment desires it, and when that is the case, it will be ordered without waiting for the application of counsel." *Johns* v. *Johns*, 20 Md. 58. And it will not be granted unless the proposition receives the support of a majority of the Judges who heard the case. *Roman* v. *Mali*, 42 Md. 558.

It is said in 18 *Ency. of Pl. and Pr.*, 63, that "The filing of a petition for a re-hearing does not of itself operate as the stay of a *remititur*, nor does it have the effect of a *supersedeas*. The judgment on appeal is not suspended, and proceedings which may have been had under the judgment are not affected thereby." Although in some of the cases cited in the notes, as a foundation for the text, the practice is shown to be different from ours in reference to motions for new trials, which those Courts deem analagous to motions or re-hearing, our rule as to the latter is such that it seems to be clear that it was not in-

tended to give the losing party the right to stay the enforce-
ment of a judgment or decree by filing such a motion. It
might in many cases work great injustice if it were allowed.

The better practice is, however, for the party desirous of
having a writ of *fieri facias* issued during the period of thirty
days, allowed in which to file a motion for re-argument, to
apply to this Court for such leave, for if any one of the Judges
taking part in the decision of the case be desirous of a re-ar-
gument it would be more orderly to stay all further proceed-
ings until the majority of the Court can determine whether it
shall be granted—unless there be some special reasons for
proceeding at once, such as the attempt of the losing party
to dispose of his property or to place it beyond the reach of
his creditors in which event the application should show the
necessity for issuing a *fieri facias*, or other writ, at once. We
now have under consideration the propriety of adopting some
additional rules affecting the practice in respect to motions for
re-arguments which may hereafter avoid some of the existing
uncertainties and difficulties, but as the rule now is we are of
the opinion that a mere motion for re-argument does not op-
erate as a stay or *supersedeas* and in order to have such an
effect there must be some action by the Court—taken at the
instance of the party making the motion.

2. The other question is, can the appellants proceed against
Mr. Ulman by a writ of *fieri facias* to recover the costs? Sec. 8
of Art. 24 of the Code provides that, "Whenever any suit or ac-
tion, whether in the name of the State or of an individual shall
be marked for the use of any person, the person for whose use
such suit or action is marked shall be liable for costs as if he
were the legal plaintiff." That statute is to be found under
the Article on "Costs," and applies to Chancery proceedings
as well as to those at law. See *Miller's Eq. Proc.*, 106, 348.
The legal and equitable plaintiffs are both liable for costs, 2
*Poe.*, sec. 212. That being so, can an equitable plaintiff relieve
himself from such liability by entering the case to the use of
another after the costs have been incurred by the other party?
In *Ruddell* v. *Green*, 104 Md. 371, we held that Mr. Ruddell

was not relieved by striking out the entry to his use in the trial Court and making the entry to the use of another before judgment in this Court. In that case there were no such entries in this Court and hence it differs in that respect from the one now under consideration, but in passing on the question CHIEF JUDGE MCSHERRY said, "While it is true that the right to costs does not become vested until final judgment has been pronounced, nor do they, until then, become a debt against the party upon whom they are imposed; 5 *Ency. Pl. & Pr.*, 121; *Ross* v. *Harper*, 99 Mass. 125; still the *liability* for costs attaches, under the Code, to the person for whose use the suit is marked, at the moment he is thus made the *cestui que use.* That liability continues precisely as the liability of a surety for costs continues, until the final determination of the case, when, if the judgment be against the plaintiff, the liability at once ripens into a debt due by the party on whom they are imposed. In the case at bar the record in this Court remained unchanged as to the *cestui que use* and when the judgment for costs was pronounced it was pronounced against the plaintiffs of record in this Court, that is to say, against the legal plaintiff and the person to whose use the suit was marked in this Court."

But although the order to strike out the use to Mr. Ulman and to enter the case to the use of Mr. Hirsh was filed with the Clerk of this Court, can an equitable plaintiff relieve himself of liability for costs already incurred by such an order? As we have seen, this was entered to the use of Mr. Ulman before the answers were filed and so continued until after the record and briefs were printed. All of the costs were incurred with the exception of those which followed the decision of this Court, which are but a trifle as compared with the other costs. If an equitable plaintiff can thus avoid liability for costs, he could do so by striking out the use to him the day before the opinion was filed. It would seem clear that he cannot thus escape the liability for costs which attached to him when he became the *cestui que use*, and that an equitable plaintiff should not be permitted to strike out his name without at least first

applying to this Court and obtaining its consent, after the costs in this Court have been incurred. Such a practice would require us to examine the dockets whenever we file opinions in order to know who are to be held liable for costs.

In *Selby* v. *Clayton*, 7 Gill, 240, there was an attempt to make Selby a competent witness by his executing a release to his trustee in insolvency, but our predecessors held he was still liable for costs and was therefore an incompetent witness as the law then was. So in *Wade* v. *Lynch*, 21 Md. 534, a release from Lynch to his trustee divesting himself of all interest in the cause was offered in evidence, but the Court held that such release "could not affect the rights of the appellant; he was not a party to it, and should not be concluded by it." Then in *Riley* v. *First Nat'l Bank*, 81 Md. 14, there had been an attempt to dismiss some of the plaintiffs and a number of the defendants from the bill but this Court said: "We cannot conceive of a practice better calculated to lead to unsatisfactory results than that followed in this case. After a bill has been filed and proceedings had under it, when counsel have appeared and costs have been incurred, it would be an unfair advantage to allow to the plaintiff's attorney the right to dismiss his client's complaint as to parties, either plaintiffs or defendants, without the previous sanction of the Court." Of course we understand that that was a case in which the plaintiff's attorney undertook to dismiss some plaintiffs and defendants who were parties to and named in the bill, but the principle is the same, for no equitable plaintiff should be permitted to thus relieve himself of liability for costs which had already attached to him by the simple process of striking out the use, without the sanction of the Court, or agreement of the parties. Inasmuch therefore as there was no application to the Court for permission to strike out the name of Mr. Ulman as equitable plaintiff, and no such sanction obtained, he must be treated as still an equitable plaintiff when the decree was passed, and *as such* liable for the costs—which by the decree were "to the appellants."